Thomas Johnson *vs.* Portland Terminal Company.

Cumberland.     Opinion October 14, 1932.

**312**

*Hinckley, Hinckley & Shesong*, for plaintiff.
*Perkins & Weeks*, for defendant.

SITTING: PATTANGALL, C. J., DUNN, STURGIS, BARNES, THAXTER, JJ.

PATTANGALL, C. J. Exception to the direction of verdict for defendant. Action for damages arising from injuries claimed to have been sustained by reason of defendant's negligence in operating a shifting train with which plaintiff's automobile collided on a grade crossing.

A presiding justice at *nisi prius* is authorized to direct a verdict for either party in any civil case when a contrary verdict could not be sustained by the evidence. *Bank* v. *Sargent*, 85 Me., 349, 27 A., 192; *Bennett* v. *Talbot*, 90 Me., 229, 38 A., 112; *Coleman* v. *Lord*, 96 Me., 192, 52 A., 645. If plaintiff's evidence, given all of the force to which it could fairly be entitled, is insufficient to make a *prima facie* case, a verdict for defendant may properly be ordered. *Heath* v. *Jaquith*, 68 Me., 433; *Jewell* v. *Gagne*, 82 Me., 430, 19 A., 917; *Co-operative Society* v. *Thorpe*, 91 Me., 64, 39 A., 283. It is only when the case is doubtful and different

conclusions might reasonably be drawn from the evidence that the facts should be submitted to the jury. *Young* v. *Chandler*, 102 Me., 253, 66 A., 539.

Applying these recognized rules to the instant case, plaintiff's exception must be overruled. The evidence presented is insufficient to support a verdict for the plaintiff and it would be the duty of the Court to set aside such a verdict had one been rendered.

The collision occurred at a crossing with which plaintiff was thoroughly familiar. His hours of employment were such that he usually left his place of business shortly after midnight and drove to a restaurant for lunch, returning to his apartment on the second floor of the building in which his store was located. The usual course thus travelled necessitated crossing the railroad tracks at the point where the accident occurred.

These tracks, three in number, crossed the highway at an angle and constituted part of the terminal yard. No regular trains traversed them, but frequently, both by night and day, shifting engines passed over them hauling substantial trains of cars. There was no gate at the crossing and not always a flagman. A general rule laid down by the defendant company and appearing in its book of instructions to employees provided that "Shifters moving over public crossings when crossing flagman not on duty, or where none are stationed, must arrange for one member of the crew to properly flag the crossing; this rule will also apply to private crossings."

Plaintiff had noticed many times during the eighteen months prior to the accident the presence of a trainman at the crossing, walking ahead of an oncoming train, carrying a lantern. On the night in question no such precaution was taken. There was, however, no difficulty in observing a train as he approached the scene of the trouble. There was an electric street light near the crossing, and plaintiff had an unobstructed view of the track after reaching a point approximately eight hundred feet distant from it and from then on to the place of collision.

He testified that as he drove along he saw an engine standing still on the nearest track within ten or twelve feet of the highway. He did not notice any cars attached to the engine, although it is agreed that nineteen freight cars, eleven of them loaded, were so

attached. He added that there were no lights on the engine or tender, that no bell was sounded, that no employees were in sight, and that there was nothing to indicate that any risk of collision would be incurred by crossing the tracks.

The evidence is clear, although plaintiff's recollection was otherwise, that the train was on the middle track. Plaintiff admits seeing the engine from the time when he was distant about eight hundred feet and continuing to observe it until within forty or fifty feet of the crossing, when he says he turned his head to watch for approaching trains in the opposite direction. He admits that during the last second or two before the collision he increased the speed of his car to fifteen or twenty miles an hour, having previously slowed down in order to negotiate a double curve in the highway.

The travelled portion of the highway was twenty-five feet wide. According to plaintiff's testimony the engine was standing twelve feet from the edge of the way on his right as he approached. The track crossed the highway diagonally, the distance from the engine, as located by plaintiff, to the opposite end of the crossing being forty-seven feet. The collision occurred within twelve feet of the edge of the way on plaintiff's left. The engine, then, would be obliged to travel approximately thirty-five feet in order to arrive at the point of contact coincidentally with the automobile which, during the same space of time, was travelling forty or fifty feet at a speed of fifteen or twenty miles an hour. Allowing a reasonable margin of error in estimates of speed and distance, matters which it is impossible for witnesses to state exactly, it may be assumed that not more than three seconds elapsed between the time when plaintiff last observed the engine and the time when he felt the impact of the tender against his automobile. His theory is based upon the proposition that in that space of time the engine, which plaintiff had seen standing still, unlighted, apparently unattended and abandoned, had gotten under weigh and had dragged the train a distance of twenty-seven feet. The conclusion is irresistible that plaintiff was mistaken in assuming that the train was stationary when he first saw it, that it must have been in motion when he turned to look toward his left, and that had he exercised the degree of care which the situation demanded, he could not have failed to discover the fact.

Plaintiff bases his right to recover on the allegations that defendant negligently failed to give him warning of the approach of . the train by means of a light on the locomotive, by sounding a bell or whistle, or by stationing a flagman at the crossing. Assuming these claims to have been sufficiently substantiated to raise questions which should have been submitted to the jury, plaintiff's case still lacked an important element. It was incumbent on him to show that he was in the exercise of ordinary care.

The law regarding the duty of travellers approaching railroad crossings has been fully discussed and plainly stated in many opinions by this Court. Among the cases to which reference may be made on this point are *Grows* v. *M. C. R. R. Co.*, 67 Me., 100; *Lesan* v. *M. C. R. R. Co.*, 77 Me., 85; *Chase* v. *M. C. R. R. Co.*, 78 Me., 346, 5 A., 771; *Garland* v. *M. C. R. R. Co.*, 85 Me., 519, 27 A., 615; *Smith* v. *M. C. R. R. Co.*, 87 Me., 339, 32 A., 967; *Giberson* v. *B. & A. R. R. Co.*, 89 Me., 337, 36 A., 400; *Day* v. *B. & M. R. R. Co.*, 96 Me., 207, 52 A., 771; *Sykes* v. *M. C. R. R. Co.*, 111 Me., 182, 88 A., 478; *McCarthy* v. *B. & A. R. R. Co.*, 112 Me., 1, 90 A., 490; *Hesseltine* v. *M. C. R. R. Co.*, 130 Me., 196, 154 A., 264.

Ordinary prudence required that he look in both directions before attempting the crossing. The omission of warning signals by the trainmen did not relieve him from the imputation of negligence when he failed to do so. Had he looked toward his right, even when he reached the first railroad track, he could not have failed to see the approaching train; and had he been proceeding at a speed consistent with safety under the existing circumstances, he could even then have stopped his car and averted the collision. His own negligence was the proximate cause of the collision and the injuries which he suffered because of it.

*Exceptions overruled.*