**Carroll CARON**

**v.**

**Dr. Loring PRATT.**

Supreme Judicial Court of Maine.

April 23, 1975.

Jerome G. Daviau, Waterville, for plaintiff.

Mahoney, Robinson, Mahoney & Norman by Lawrence P. Mahoney, Portland, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

POMEROY, Justice.

This action, charging defendant with malpractice, is before us on appeal from the direction of a verdict for the defendant.

We deny the appeal.

The plaintiff underwent a tonsillectomy, performed by the defendant, on September

29, 1966. No apparent complications having developed, plaintiff was discharged from the hospital shortly thereafter. His readmission five days later was occasioned by the fact that he was experiencing some bleeding while at home.

During the early morning hours of October 5, he began "spitting up blood." He was seen in the hospital by the defendant, who anesthetized him and "sutured the bleeding blood vessel." Later, during the afternoon of the same day, another more serious bleeding episode occurred. The defendant was not in the City at the time but was notified by telephone of plaintiff's condition. He discussed the case with another physician on duty at the hospital, requesting him to look after plaintiff until he could get there. By the time defendant arrived at the hospital a surgical procedure involving an incision in the neck and ligation of part of the branches of the external carotid artery had been partially completed. The attending surgeon's report included the following findings:

"There were two fair-sized holes in what appeared to be a large vessel, and they were pumping out blood. It was impossible to put any sutures in this region."

Plaintiff's condition stabilized somewhat thereafter, although two subsequent bleeding episodes on October 10th and October 14th required further suturing, and eventually ligation of all remaining major branches of the external carotid artery. On October 31, 1966, plaintiff was discharged from the hospital.

At trial, plaintiff availed himself of the provisions of Rule 43(b) M.R.Civ.P., which allowed him to call the defendant as his witness, interrogate him by leading questions, and impeach and contradict him in all respects as if he had been called by an adverse party. His obvious purpose in doing so was to elicit from the defendant himself those facts which would prove the latter's failure to exercise reasonable care in his treatment of the case.

Defendant testified essentially that the surgical procedure he employed in this case was the same normal careful procedure he had employed in performing over 8,000 other tonsillectomies.

It was his experience, he testified, that in the ordinary course of post-operative healing, all tonsillar fossae became infected to a greater or lesser degree, causing some necrosis of the blood vessels in the localized area. He attributed the two holes in plaintiff's artery to this "infectious process" in the throat region which erodes the blood vessels.

That the holes could not have been caused by any manual imprecision during the original surgery was patent, in his opinion, because

"If you create a hole and rent at the time of surgery in an artery like this, you would be flooded with blood, so you would know it right then, and you wouldn't find it out seven days later."

To discredit defendant's testimony attributing plaintiff's bleeding to a diseased blood vessel, plaintiff offered into evidence a deposition taken from a Massachusetts physician specializing in internal medicine and neurology. That deposition read, in material part:

"Question: Now, first Doctor, whether an artery which has a rent or a hole in it can this occur without trauma?

The Witness: No, it cannot.

Question: Now once there is a rent or hole can it be sutured and closed?

*  *  *  *  *  *
Answer: Yes, the artery can be sutured."

The trial Justice sustained defendant's objection to the admission of the proffered deposition on the grounds the physician

" . . . does not describe what he contends would be a type of rent or hole he was talking about, he does not refer to the records or the notes of the review of the material that was made available

to him. He does not in any way describe what he called 'trauma,' whether it is from an outside force, or a result of a disease. And he does not qualify as an expert in the field of otolaryngology."

Plaintiff did not present any medical or expert testimony other than the disputed deposition.

■ At the close of plaintiff's evidence, the Court in directing a verdict for defendant, observed that neither party had called to the stand the two surgeons who had treated plaintiff in defendant's absence although both physicians were present and available as witnesses throughout the trial. The defendant's testimony assigning the cause of plaintiff's bleeding to an unavoidable infection was therefore not contradicted by any *direct medical evidence* attributing the bleeding to any act or omission on the part of the defendant.

With the evidence in this posture, the plaintiff had failed to establish a case which would warrant submission of the issue of defendant's negligence to the jury.

■ The doctrine of *res ipsa loquitur* was unavailable to plaintiff in the opinion of the Court, because .

"Negligence on the part of physicians and surgeons by reason of their departure from the recognized standards of practice has to be established by medical testimony. Negligence will not and cannot be presumed and cannot be inferred from the occurrence alone, and there is testimony only that the patient developed an infection in the area under treatment, and this does not in and of itself raise a presumption or inference of negligence."

We consider the ruling of the trial Justice to be substantially a correct statement of the law of this State.

Plaintiff advances the argument that the deposition of the Massachusetts specialist constituted legally competent expert evidence that the unusually excessive bleeding could *not* have been caused by disease. Therefore, he says, its admission would have generated an issue for the triers of fact.

Failing a favorable ruling on the admissibility of the deposition however, plaintiff places his reliance on the doctrine of *res ipsa loquitur*. That rule, he urges, operates to supply an inference of negligence, sufficient to take the case to the jury notwithstanding the absence of any direct medical evidence to indicate that plaintiff's damage was caused by the failure of defendant to exercise reasonable care and diligence in his treatment of the case. Specifically, plaintiff claims the introduction of evidence that "unusual" and unexplained bleeding occurred coincidentally with the performance of surgery performed by the defendant, standing alone, raises an inference of the latter's negligence.

Established by the evidence was (a) that the defendant had performed a tonsillectomy, (b) that following the surgery there was unusual bleeding from the area of the tonsillectomy, and (c) two rents or holes were observed in an artery some five days after the surgery from which holes there was excessive bleeding.

The gap between the evidence and legal liability becoming fixed on the defendant was that there was no evidence in the case establishing causal connection between defendant's conduct and the unusual post-surgical happenings.

The question then becomes, had the deposition of Dr. England been received in evidence, would it have closed the gap and thus created an issue for a decision of the jury?

■ The relevant portion of Dr. England's deposition was that the rents or holes could not have existed without trauma. At no time did he explain what he meant by

"trauma." There was no evidence in the case which could permit a reasonable jury to conclude that the defendant had not employed acceptable surgical procedures.

We consider the deposition was properly excluded from evidence on either of the following grounds:

1. It had no bearing on the question whether or not the defendant had employed acceptable surgical procedures in performing the tonsillectomy.

2. The general statement that arteries do not develop holes or rents without trauma in the absence of any definition of the term "trauma" was not relevant.

■ Such testimony can, in no way, be characterized as an expression of opinion that defendant had violated community standards of proper medical treatment. Nor does it constitute evidence that the surgical procedure undertaken by defendant was the legal cause of plaintiff's injury. It was the responsibility of the trial Justice to determine, in the exercise of sound discretion, the relevancy of the proffered testimony. Turgeon v. Lewiston Urban Renewal Authority, Me., 239 A.2d 173, 174 (1968). Because the proffered testimony had no probative value on the issue of defendant's legal liability it was properly excluded.

However, assuming for the purposes of argument only, the testimony had probative value, the record nevertheless demonstrates that the witness was unqualified in any event to express an opinion as to the probable negligence of this defendant.

■ Having stated that he was a specialist in internal medicine and neurology, the witness conceded that he had never performed a surgical procedure. While we need not decide whether a physician in general practice or specializing in a different field of medicine is ever qualified to testify as an expert as to the proper surgical procedures to be undertaken by a surgeon specializing in otolaryology, we believe it was well within the wide discretion of the trial Justice to exclude as incompetent the opinion of a physician specializing in a wholly unrelated and non-surgical branch of medicine.

"Whether this witness was qualified to testify as an expert, was a question of fact for the presiding judge, and his decision of such a question is usually final. In extreme cases, where a serious mistake has been committed through some accident, inadvertence, or misconception, his action may be reviewed. This is not such an instance." Fayette v. Chesterville, 77 Me. 28, 33 (1885).

Defendant's legal obligation to the plaintiff was clearly defined in Coombs v. King, 107 Me. 376, 78 A. 468 (1910).

"The measure of a physician's legal responsibility has been stated many times by this court. He contracts with his patient that he has the ordinary skill of members of his profession in like situation, that he will exercise ordinary or reasonable care and diligence in his treatment of the case, and that he will use his best judgment in the application of his skill to the case. . . ." 107 Me. 376, 378.

■ Proof of an unfavorable result, without more, will not suffice to establish the liability of a physician. Downer v. Veilleux, Me., 322 A.2d 82 (1974); Duguay v. Pomerleau, Me., 299 A.2d 914 (1973).

". . . the plaintiff must prove that the poor result was caused either by the defendant's lack of that degree of skill and knowledge ordinarily possessed by physicians in his branch of medicine, or, by his failure to exercise his best judgment in the application of that skill, or, by his failure to use ordinary care in performing the operation or in administering the treatment involved." 322 A.2d 82, 87.

In *Downer,* the plaintiff sustained multiple fractures and injuries in an automobile accident. Defendant, a general surgeon who ministered to plaintiff upon her admission to the hospital, elected not to reduce the fracture of the femoral neck. The bone did not heal properly. To establish defendant's negligence in failing to reduce the fracture, in applying traction instead of another recognized form of treatment, and in failing to consult with an orthopedic specialist, plaintiff introduced the testimony of Dr. England, an internist-neurologist. The sum of Dr. England's testimony was that the plaintiff did experience a "poor result," the exact cause of which could not be stated with certainty, and that it was "bad practice" not to have consulted a specialist. We held that in the absence of any *direct medical evidence* to show the objective standard of care required of the defendant, and his departure from such recognized practice, a verdict for defendant was properly directed.

Similarly, in Cyr v. Giesen, 150 Me. 248, 108 A.2d 316 (1954), this Court denied an appeal from the granting of a nonsuit for defendant where the expert testimony, although establishing that plaintiff had developed aseptic necrosis of the femur following a transcervical fracture of the bone failed to indicate that defendant had breached any recognized standards of treatment or care.

Cyr held that where the exercise of proper skill or treatment on the part of a physician is in issue, expert medical testimony is essential, unless the consequences are of such extraordinary character that a layman is able to say as a matter of common knowledge they would not have followed had due care been exercised.

"The case under consideration concerns such technical and involved medical procedure that it rules out any possibility of understanding on the part of a layman as to its medical nature and it is therefore self evident that this is not a case falling within the exception of the general rule relating to expert medical testimony in malpractice cases." 108 A. 2d 316, 318.

While there is no express mention in Cyr of the doctrine of *res ipsa loquitur,* the Cyr rule states a requirement that has been uniformly attached to the invocation of that doctrine in medical malpractice actions. Lambert v. Soltis, 422 Pa. 304, 221 A.2d 173 (1966); Hasemeier v. Smith, Mo., 361 S.W.2d 697 (1962); Lyu v. Shinn, 40 Hawaii 198 (1953); Hornbeck v. Homeopathic Hospital Association, Del.Super., 197 A.2d 461 (1964); Hoffman v. Naslund, 274 Minn. 521, 144 N.W.2d 580 (1966).

Moreover, it has been specifically recognized that the mere fact that a patient develops an *infection in the area under treatment* does not raise an inference of negligence on the part of the physician. Haliburton v. General Hospital Society, 133 Conn. 61, 48 A.2d 261 (1946); Harmon v. Rust, Ky., 420 S.W.2d 563 (1967); Pfeifer v. Konat, 181 Neb. 30, 146 N.W.2d 743 (1966); Buchanan v. Downing, 74 N.M. 423, 394 P.2d 269 (1964); Smith v. Curran, 28 Colo.App. 358, 472 P.2d 769 (1970).

In view of our conclusion that a verdict for defendant was properly directed, we have no need to discuss the other issues raised by this appeal.

The entry must be,

Appeal denied.

All Justices concurring.